# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

LISA GALLEGOS,

          Plaintiff,

    v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

          Defendant.

Case No.  16-cv-01268-BLF

**ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
JUDGMENT UNDER RULE 52;
ISSUING FINDINGS OF FACT AND
CONCLUSIONS OF LAW UNDER
RULE 52; AND DENYING
DEFENDANT'S MOTION FOR
JUDGMENT UNDER RULE 52**

[Re:  ECF 42, 43]

Prior to stopping work due to her disability, Plaintiff Lisa Gallegos ("Gallegos") was a Drug Safety Operations Manager at Jazz Pharmaceuticals ("Jazz") in Palo Alto, California.  She sought short-term and long-term disability claims under the terms of Jazz Pharmaceuticals Disability Plan ("the Plan"), an employee benefits plan governed by ERISA.[1]  As the administrator of the Plan, Defendant The Prudential Insurance Company of America ("Prudential"), initially granted the short-term and long-term claim but later terminated the long-term disability benefit as of April 13, 2015.  AR 4642, 4947, 4958.

The parties have filed cross motions for judgment pursuant to Federal Rule of Civil Procedure 52.  Gallegos seeks a determination that she was disabled from both her regular occupation and any gainful occupation as those terms are defined under the Plan and Prudential seeks a contrary determination.  The Court set a "Hearing on Dispositive Motions/Bench Trial" for May 5, 2017 and heard extensive oral argument of counsel on that date.  For the reasons discussed below, the Court GRANTS IN PART Gallegos' Rule 52 motion, issues Findings of Fact and

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.

1 | Conclusions of Law under Rule 52, and DENIES Prudential's motion.

2 | **I. LEGAL STANDARD**

3 |     Federal Rule of Civil Procedure 52 provides that "[i]n an action tried on the facts without a

4 | jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R.

5 | Civ. P. 52(a)(1). "In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the

6 | court does not determine whether there is an issue of material fact, but actually decides whether the

7 | plaintiff is [entitled to benefits] under the policy." *Prado v. Allied Domecq Spirits and Wine Group*

8 | *Disability Income Policy*, 800 F. Supp. 2d 1077, 1094 (N.D. Cal. 2011) (citing *Kearney v. Standard*

9 | *Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). In making that determination, the court must

10 | "evaluate the persuasiveness of conflicting testimony and decide which is more likely true" in order

11 | to make findings of fact that will be subject to review under a clearly erroneous standard if appealed.

12 | *Kearney*, 175 F.3d at 1095.

13 |     On January 3, 2017, this Court ruled that the standard for judicial review is de novo. ECF

14 | 35. The Court thus determines based on the evidence in the administrative record whether

15 | Gallegos carries the burden of showing, by a preponderance of the evidence, that she was disabled

16 | under the terms of the Plan, without according deference to Prudential's denial of claim. *Abatie v.*

17 | *Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006); *Oster v. Standard Ins. Co.*, 759 F.

18 | Supp. 2d 1172, 1185 (N.D. Cal. 2011); *Kearney*, 175 F.3d at 1087-90. To prevail, Gallegos needs

19 | to prove it is "more likely than not" that she was disabled under the terms of the Jazz

20 | Pharmaceuticals Long-Term Disability Plan. *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159,

21 | 1163 (9th Cir. 2016) (standard of proof in de novo ERISA disability claim is preponderance of the

22 | evidence); *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 404 (9th Cir. 1996) (defining

23 | "preponderance of the evidence" as "more likely than not").

24 | **II. FINDINGS OF FACT**

25 |     **A. Ms. Gallegos's Occupation**

26 |     Prior to becoming disabled, Gallegos was a Drug Safety Operations Manager at Jazz

27 | Pharmaceuticals in Palo Alto, California. AR 2913. As a Drug Safety Operations Manager, Ms.

28 | Gallegos was "responsible for ensuring the Drug Safety and Pharmacovigilance department

operational functions are documented . . . and optimized." *Id.* As set forth in her job description, performing key drug safety functions required "excellent verbal and written communication skills," and "[e]valuative, analytical, and interpretative skills enabling review and development of reports and other documents used in support of Drug Safety and Pharmacovigilance compliance." *Id.* Prior to leaving Jazz, she had spent nearly a decade in the pharmaceutical compliance field. AR 4404.

### B. The Long-Term Disability Plan

At all relevant times, Jazz provided its employees with long-term disability benefits under the Jazz Pharmaceuticals Long-Term Disability Plan. AR 4919. Prudential issued a group long-term disability insurance policy, under which Jazz was a participating employer and under which Gallegos was a covered employee. *Id.* Prudential receives and decides long-term disability claims submitted by Jazz employees. AR 4947, 4958.

#### i. The Plan's definition of disability

The policy of the Plan sets forth the following definitions of disability to determine eligibility for benefits. AR 4923.

> You are disabled when Prudential determines that:
> - you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to your ***sickness*** or ***injury***; and
> - you are under the ***regular care*** of a ***doctor;*** and
> - you have a 20% or more loss in your ***monthly earnings*** due to that sickness or injury.
>         After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:
> - you are unable to perform the duties of any ***gainful occupation*** for which you are reasonably fitted by education, training or experience; and
> - you are under the regular care of a doctor.

AR 4928.

> ***Material and substantial duties*** means duties that:
> - are normally required for the performance of your regular occupation; and
> - cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**Regular occupation** means the occupation you are routinely performing when your disability begins.  Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at specific location.  AR 4928.

**Gainful occupation** means an occupation, including self-employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds:

- 80% of your **indexed monthly earnings** if you are working; or
- 66 2/3% of your monthly earnings if you are not working.

AR 4929.

The Plan further provides that disability benefits will cease under several conditions, including on the earliest of the date the claimant is no longer disabled under the terms of the Plan, or the date the claimant fails to submit proof of continuing disability satisfactory to Prudential. AR 4936-37.

### C.    Gallegos's Medical Conditions and Disability

Around October 2, 2012, Gallegos took leave from work due to headaches with altered vision and left-sided numbness.  AR 204-5.  These headaches occurred on a "daily basis" and Gallegos was feeling nauseated "constantly."  AR 42.  Prudential reviewed her medical records and approved short-term disability benefits, concluding it was "reasonable that the claimant's daily headaches are of a severity that would preclude her from being able to function adequately and/or sustainably in a workplace environment."  AR 205.  She returned to Jazz in January 2013 but took time off again starting June 21, 2013 for shoulder surgery due to a torn rotator cuff.  AR 201, 215, 241-42, 261.  Gallegos submitted a short-term disability claim and again, Prudential approved the claim.  AR 344.  Following recovery from surgery, Gallegos returned to work in September 2013.  AR 337, 354.  At the time, Gallegos informed Prudential that her doctor "doesn't think it is a good idea" to be released to work, but she returned anyway.  AR 354, 361.

About six months later, Gallegos began suffering from severe fatigue and headaches with eye pain and facial numbness.  AR 380, 391.  She also noticed increasing pain, weakness, headaches, sensitivity to light, and cognitive issues including reduced memory and concentration.  AR 380, 391.  Gallegos's primary care doctor, Dr. Jeff Tao, concluded that "she unfortunately is unable to function correctly from a work standpoint," and recommended that she go on disability

for at least 12 weeks.  AR 391-92.  Based on her symptoms, her rheumatologist, Dr. Michael Neuwelt, diagnosed her with systemic lupus erythematosus ("Lupus") pursuant to standard American College of Rheumatology criteria.  AR 380, 4376.  In addition to her Lupus diagnosis, Gallegos suffers from adrenal insufficiency, chronic sinusitis, antiphospholipid syndrome, relapsing polychondritis, Hashimoto's thyroiditis, and continues to suffer from her regular migraine headaches.  AR 425, 457.

### i. Lupus diagnosis by Dr. Neuwelt

Lupus expert Clark Neuwelt, M.D. is a Clinical Professor of Medicine at the University of California, San Francisco, Chief of Rheumatology at Alameda County Medical Center, and Director of Rheumatology at St. Mary's Medical Center, San Francisco.  AR 4377.  He has been Gallegos' rheumatologist since 2012.  AR 406; 4376.  He has treated her for "systemic lupus erythematosus, shortness of breath, transient monoclonal gammopathy, relapsing polychondritis, hashimoto thyroiditis, pseudotumor cerebri, demyelinating brain lesions, paresthesais in both arms and legs, carpal tunnel syndrome, cognitive decline, hallucinations, Jaccoud arthropathy hands, Raynaud's, hair fall, recurrent sinus infections, elevated liver function, and asystole, among other things."  AR 4376.

Based on examination and clinical history, Dr. Neuwelt found "9 out of 11 [American College of Rheumatology] diagnostic criteria: Malar rash, discoid rash, photosensitivity, oral ulcers, arthritis, renal disorder, neurologic disorder, immunologic disorder (as shown by her positive lupus anticoagulant confirmed by Dr. Joelson), antinuclear antibody." *Id.*; *see also* AR 610-11.  Dr. Neuwelt concluded Lupus is "the physical cause of Ms. Gallegos's reported symptoms of reduced cognitive ability, fatigue, weakness, and shortness of breath." *Id.*
Dr. Neuwelt also started Gallegos on a regimen of methotrexate, Plaquenil, and prednisone for Lupus treatment.  AR 4265.  This treatment caused Gallegos to suffer from a wide range of unwanted side effects.  Prednisone caused her "agitation, dizziness, fatigue, irritability, mood changes, shortness of breath, weight gain, swelling, development of hump on the back of my neck, and facial hair."  AR 4421.  Methotrexate has caused "hair loss, skin turning bright red when going outside, lower leg swelling where my feet can barely fit into my shoes, severe muscle

cramps, including in my feet and fingers, fatigue, dizziness, nausea, fuzzy vision and rapidly graying hair." AR 4421-22. Gallegos' primary care doctor, Dr. Tao, documented these changes as well. AR 1987.

### ii.  Dr. Joelson's findings

Like Dr. Neuwelt, Gallegos' neurologist Dr. Joelson has treated her since 2012. AR 4370. Through treatment and examination, he concluded that Gallegos suffers from a distinct chronic headache condition that by itself is disabling and "prevent[s] her from working." AR 4371. Dr. Joelson opined that the "abnormal antiphospholipid antibody panel associated with her rheumatologic condition likely explains the brain MRI findings demonstrating subcortical white matter changes." AR 4370.

But Dr. Joelson also determined Gallegos' Lupus is "directly impacting on her neurologic presentation, manifesting as headaches." *Id.* These "Lupus headaches" occur while she continues to have disabling breakthrough migraine headaches, which are separate and distinct from her Lupus headaches, and have the potential to escalate with stress. *Id.* Dr. Joelson conducted an electromyography study that confirmed carpal tunnel syndrome on her left wrist. AR 4370.

### iii.  Dr. Rubinstein's findings

Dr. Rubinstein has been Gallegos' immunologist for over 21 years. AR 4373. He describes her approach toward working for as long as she did, in spite of her Lupus symptoms, as "heroic." *Id.* Dr. Rubinstein concluded that "in correlation with her diagnosis of lupus, her symptoms have become debilitating in terms of chronic diffuse musculoskeletal pain, increasing fatigue, and frequent shortness of breath and breakthrough headaches . . . she is in a constant state of pain, mental fogginess, and significant fatigue that precludes her ability to work with any degree of regularity because of the debilitating and unpredictable nature of her baseline symptoms and symptomatic flares." *Id.* When interviewed by Prudential about Gallegos, Dr. Rubinstein further explained that "cytokines released by her overactive immune system affect her concentration and energy level to a marked degree (from the allergic rhinitis)." AR 4465. He concluded her prognosis for long term recovery is "poor." *Id.*

### iv.  Dr. Tao's findings

6

Jeff Tao, M.D., is Gallegos's primary care doctor. After examining Gallegos on August 29, 2014, he recommended she take disability leave from Jazz. AR 391. At that appointment, he noted that "[t]hings are not going well" with Gallegos. *Id.* She "has headaches all the time," "is extremely fatigued and [sic] very little energy," "is forgetful, has a difficult time comprehending things," and "[h]er glands are swollen." *Id.* Based upon his assessment, Dr. Tao determined that Gallegos was no longer capable of working. *Id.* Dr. Tao continued to treat Ms. Gallegos, and noted her symptoms were occurring consistently. AR 1986-87.

**D.    Ms. Gallegos Files Benefit Claims with Prudential and the Social Security Administration**

Pursuant to her doctors' advice, Gallegos stopped working on September 16, 2014, and filed short-term (STD) and long-term disability (LTD) claims. AR 4615. Gallegos also applied for Social Security Disability Insurance from the Social Security Administration. *See* AR 4451.

On October 17, 2014, Prudential approved Plaintiff's STD claim through December 15, 2014 and later extended it through March 16, 2015. *Id.*; AR 4085-87, AR 4095. In an initial LTD decision in February 2015, Prudential's claim manager approved the long-term claim as well, stating that, "[b]ased on clinical review . . . currently totally disabled from her own occupation . . . therefore reasonable to approve LTD claim through 06/30/2015." AR 4707. However, on March 13, 2015, Prudential informed Gallegos that it has determined her to be disabled under the Regular Occupation definition of disability, and approved her LTD claim only until March 16, 2015, the date of her next office visit with Dr. Neuwelt. AR 4632. Prudential emphasized that it needed Gallegos' March 16, 2015 office visit note in order to review for an extension of benefits. AR 4632-36.

**E.    Termination of Long Term Disability Benefits**

On April 14, 2015, Prudential terminated Gallegos' long-term disability benefit as of April 13, 2015 based on the report of a medical reviewer, Dr. Ibrahim Alghafeer. AR 4051, 4642. Even though Dr. Alghafeer reported that Gallegos "had symptoms of fatigue," he noted that there was "no documentation that her fatigue had resulted in any accidents at work place [sic] or while driving." AR 4049. As for Gallegos' positive test for "lupus anticoagulant," Dr. Alghafeer did

not think that "it can explain the bulk of her symptoms." *Id.* Dr. Alghafeer did state, however, that his review was limited to a "rheumatology perspective," and that non-rheumatological conditions including migraine headache, shoulder surgery, chronic sinusitis and endocrine issues are to be addressed by other specialties. *Id.* No other specialists had reviewed Gallegos' claim for Prudential at this point.

### F. Gallegos Appeals

On October 7, 2015, Gallegos submitted her first appeal. AR 1753-61. She included a variety of exhibits including updated medical records and letters from her treating doctors. AR 1753-54.

#### i. Functional Capacity Evaluation and Vocational Examination Results

Along with updated medical records, Gallegos submitted a functional capacity evaluation and vocational report. AR 4386-411. During her functional capacity evaluation, Gallegos was placed at a desk and keyboard where Gallegos's eyes were observed to be twitching due to irritation and pain from looking at a computer monitor. AR 4401. That evaluation also found that her range of motion is far below normal for cervical extension, cervical lateral flexion left, cervical lateral flexion right, cervical rotation left, cervical rotation right, lumbar flexion, and lumbar extension. AR 4392. Her testers observed she experienced substantial pain when lifting weights as small as three pounds. AR 4398.

Upon completion of all examinations, Vocational Consultant Alan Nelson determined that Gallegos has significant typing limitations, with "eyestrain and eyeball pain, neck and back discomfort, bilateral shoulder and hand pain, and right hand cramping, as well as fatigue and general problems with concentration during the performance of repetitive manual activities." AR 4403. According to Mr. Nelson, Gallegos simply "does not currently possess the functional capacities or mental stamina to perform" her occupation or any gainful occupation which she is trained for. AR 4410. Mr. Nelson concluded that Gallegos cannot return to regular employment because she is "unable to maintain a consistent work routine; unable to maintain appropriate pace and persistence due to physical and mental stamina limitations; and unable to meet required performance standards." AR 4411.

### ii. Prudential's Reviewers

Upon reviewing the appeal, Prudential sent the claim file to two more paper-reviewers, Dr. Sara Kramer and Dr. Stephen Selkirk, who reviewed the claim from a rheumatology and a neurology perspectives, respectively. AR 4471-500, 4154-80. Neither Dr. Kramer nor Dr. Selkirk examined or spoke with Gallegos, although they both communicated with some of Gallegos' treating doctors. *See id.*

Gallegos' treating rheumatologist Dr. Neuwelt told Prudential rheumatologist Dr. Kramer that Gallegos has "multisystem [systemic lupus erythematosus] SLE with neurological deficits, neuropathy, has cognitive decline, has pseudo tumor cerebri causing headaches, and is a very disabled young lady." AR 4493. Dr. Rubinstein, Gallegos' allergist, wrote to Dr. Kramer informing her that Gallegos suffers from fatigue "to such an extent that it interferes with her ability to work. The fatigue is caused by lupus, migraines, headaches, and sleep pathology." *Id.*

Dr. Joelson, Gallegos' neurologist, spoke with Prudential's neurologist Dr. Selkirk and informed him that Gallegos does have a headache disorder exacerbated by working and stress, and that Gallegos is completely disabled. AR 4173.

After speaking with Gallegos' doctors, Dr. Kramer and Dr. Selkirk called each other and recorded that conversation in their notes. *Compare* AR 4173 *with* AR 4493. Dr. Selkirk initiated the call, and told Dr. Kramer that he "found no disability from a neurological view point." AR 4493. Dr. Kramer told him that she had "not gone through the case completely," but that she "did not think the clamant had SLE." *Id.* Following their conference call in which both doctors heard each other's opinions, both doctors rendered opinions in favor of Prudential.

### G. The Social Security Administration Separately Concluded Gallegos is Totally Disabled

While her appeal was pending, the Social Security Administration independently concluded that Gallegos is disabled. AR 4451. Gallegos promptly submitted the Social Security award letter to Prudential. AR 4450. Prudential did not ask Gallegos to provide any other information relating to the award but merely "offset" the monetary award from Social Security, and demanded reimbursement. AR 4662.

### i. The Social Security Administration's psychological examination

The Social Security Administration reviewed the same medical records submitted to Prudential, but also hired neuropsychologist Janine Marinos, Ph.D. to perform an in-person psychological examination. AR 4587-90. After examining and interviewing Gallegos, Dr. Marinos diagnosed Gallegos with "Cognitive Disorder (due to SLE)," and noted that "any cognitive difficulties she may have would likely be exacerbated by the distractions inherent in a competitive job setting. As a result, she would likely have difficulty in maintaining concentration over the course of a normal work day." AR 4590. Based on the medical records and Dr. Marinos's report, Gallegos was awarded Social Security benefits.

### H.    Prudential Continues to Deny Disability

On December 17, 2015, Prudential denied Gallegos's appeal. AR 4666-74. The denial stated the "clinical findings contained in her file do not support a diagnosis of SLE." AR 4673. It also referenced the fact that Gallegos' headaches were "improved" with Botox injections, that there was "no record of lupus anticoagulant," and "no neurological examination findings were documented." *Id.*; AR 4672.

### I.    Gallegos' Final Appeal

In response to Prudential's denial, Gallegos submitted a second appeal. AR 4593. She provided Prudential with her abnormal lab results—which indicated Lupus—blood tests positive for the Lupus anticoagulant, and records indicating worsening headaches. AR 4217-18, AR 4222, AR 4232. She also submitted a copy of Dr. Marinos's report diagnosing Gallegos with "Cognitive Disorder (due to SLE)." AR 4217-18, AR 4672.

Upon review of this information, Prudential acknowledged that "the presence of a positive lupus anticoagulant exists." AR 4691. But it denied her appeal, relying again on the same reviewers. AR 4286-90, AR 4597-601. This time, it argued that the blood tests are "a nonspecific means to measure inflammation"; the lupus anticoagulant "does not in of itself establish disability"'; and the records contained "no documentation of any falls, dysfunction in coordination, or . . . use of a gait-assistive device." AR 4691-2. The denial letter went on to state:

"We have noted Ms. Gallegos was approved for Social Security Disability Benefits (SSDB) and we have again taken this into consideration. However, please note the Social Security

1   Administration (SSA) must make their determinations based on the information available to them

2   and their rules and guidelines, and we must render our decision based on the information available

3   in Ms. Gallegos LTD file and the provisions of the LTD Group Policy.  As such, the approval of

4   one type of benefit does not mean that another type of disability benefit will be approved; nor does

5   the denial of one type of benefit mean that another type of disability benefit will be denied."  AR

6   4692-93; AR 1832.

7   **III.    CONCLUSIONS OF LAW**

8       **A.    Plaintiff's Prior Finding as Disabled is Significant**

9       In determining whether Gallegos was disabled at the time Prudential terminated her

10  benefits, the Court begins with Prudential's STD benefits approval on October 17, 2014, through

11  December 15, 2014 and later extended through March 16, 2015.  AR; 4085-87; AR 4095; AR

12  4451.  Prudential also stated in an initial LTD decision in February 2015, that, "[b]ased on clinical

13  review . . . currently totally disabled from her own occupation . . . therefore reasonable to approve

14  LTD claim through 06/30/2015."  AR 4707.  As such, the medical file available to Prudential at

15  the time of those approvals indicated that Gallegos was disabled.  On March 13, 2015, Prudential

16  terminated Gallegos' LTD benefits, which lasted until her office visit with Dr. Neuwelt.  AR 4632.

17  Therefore, during the period from October 17, 2014 until March 13, 2015, there is no dispute that

18  Gallegos was in fact disabled for which she received STD and the initial LTD benefits.

19      "That benefits had previously been awarded and paid may be evidence relevant to the issue

20  of whether the claimant was disabled and entitled to benefits at a later date, but that fact should not

21  itself shift the burden of proof."  *Muniz v. Amex Const. Management, Inc.*, 623 F.3d 1290, 1296

22  (9th Cir. 2010); *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 589 (8th Cir. 2002) ("We are

23  not suggesting that paying benefits operates forever as an estoppel so that an insurer can never

24  change its mind; but unless information available to an insurer alters in some significant way, the

25  previous payment of benefits is a circumstance that must weigh against the propriety of an

26  insurer's decision to discontinue those payments.").

27      In accordance with Ninth Circuit law, while the burden does not shift to Prudential, prior

28  approvals constitute evidence relevant to whether Gallegos was disabled.  The record up until the

termination decision clearly demonstrated Gallegos' disability and as a result, Prudential provided STD and LTD for nearly five months. The Court then presumes Prudential relied on a significant change in the circumstances of her condition in order to recant its previous approvals and expects Prudential to provide some evidence of Gallegos' medical progression at the time of its termination of LTD benefits. *See Bledsoe v. Metropolitan Life Ins.*, 90 F. Supp. 3d 901, 910 (2015). However, a review of the record reveals no such significant change. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008) (noting that the defendant failed to "explain why further degeneration is necessary to sustain a finding that [claimant] is disabled" after defendant had been paying the claimant long-term disability benefits for a year"); *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1164 (N.D. Cal. 2010) ("Although Defendant did not need to prove a material improvement in Plaintiff's condition to defeat her entitlement to benefits, her lack of consistent, marked progress is probative of her continuing disability."). Accordingly, Prudential's prior finding of disability weighs in favor of finding disability.

> **B.    Plaintiff was Disabled Under the "Regular Occupation" Standard and the Terms of the Plan at the Time of the Denial of Benefits**

The parties do not dispute that Gallegos' position at Jazz was sedentary. AR 4743 (Prudential vocational expert stating "the occupation would be sedentary"). The Ninth Circuit has held "that an employee who cannot sit for more than four hours in an eight-hour workday cannot perform "sedentary" work that requires "sitting most of the time." *Armani*, 840 F.3d at 1163. Several other courts have recognized that sedentary work usually requires six hours of sitting. *See, e.g., LaVertu v. Unum Life Ins. Co. of Am.*, 2014 WL 1224736, at *13 (C.D. Cal. Mar. 25, 2014). Regardless, "an employee who is unable to sit for more than half of the workday cannot consistently perform an occupation that requires sitting for 'most of the time.'" *Armani*, 840 F.3d at 1163.

> **i.    Gallegos' Treating Doctors' Determinations and the Functional Capacity and Vocational Evaluations**

The administrative record indicates that Gallegos has a history of symptoms caused by systemic lupus erythematosus ("SLE") and her medication prevented her from returning to work.

Dr. Neuwelt determined Lupus is "the physical cause of Ms. Gallegos's reported symptoms of reduced cognitive ability, fatigue, weakness, and shortness of breath" and that her "comorbid conditions, specifically her systemic lupus erythematosus, prevent her from performing a sedentary occupation." AR 4376. Although neurologist Dr. Joelson diagnosed Gallegos with a chronic headache condition that by itself "prevent[s] her from working," after learning of Gallegos' Lupus diagnosis he also agreed her Lupus is "directly impacting on her neurologic presentation, manifesting as headaches." AR 4370-71. Dr. Rubinstein, an immunologist, who has treated Gallegos for over 21 years, strongly supports her disability. AR 4373; *cf. Solnin v. Sun Life & Health Ins. Co.*, No. 08--2759, 2015 WL 6550549, at *11 (E.D.N.Y. Oct. 28, 2015) (opinion of treating doctor was "highly probative" based on treatment spanning from 1999 to 2012); *id.* at *12 ("the Court finds the reports of . . . those doctors who saw her only one time . . . less persuasive."); *Haning v. Hartford Life & Accident Ins. Co.*, 140 F. Supp. 3d 654, 665 (S.D. Ohio 2015) ("The Court considers these repeated in-person evaluations from [plaintiff's] primary care physician (who had treated her for over twenty years) . . . strong evidence of her long-term disability."). Dr. Rubinstein found that "in correlation with her diagnosis of lupus, her symptoms have become debilitating in terms of chronic diffuse musculoskeletal pain, increasing fatigue, and frequent shortness of breath and breakthrough headaches . . . she is in a constant state of pain, mental fogginess, and significant fatigue that precludes her ability to work with any degree of regularity because of the debilitating and unpredictable nature of her baseline symptoms and symptomatic flares." AR 4373. When Prudential's reviewing doctor contacted him, Dr. Rubinstein told her that Gallegos's Lupus-fatigue "is absolutely to such an extent that it interferes with her ability to work." AR 4493.

Finally, Gallegos' primary care doctor, Dr. Jeff Tao, oversaw Gallegos' progression of symptoms. Dr. Tao observed "[t]hings are not going well," she "has headaches all the time," "is extremely fatigued and [sic] very little energy," "is forgetful, has a difficult time comprehending things," and "[h]er glands are swollen." AR 391.

As outlined above, Prudential's reviewers placed no weight on these doctors' examinations as well as Gallegos' self-reported symptoms. Specifically, Dr. Kramer noted that Gallegos

13

"complains of fatigue; however there is no demonstration of how this interferes with her ability to work." AR 4494. As such, Dr. Kramer neglected the examination notes and statements from four separate treating doctors. Dr. Kramer also did not explain why results of the functional capacity examination and vocational evaluations do not support a finding of disability—a literal "demonstration of how [fatigue] interferes with her ability to work"—even though her report says it was reviewed. AR 4487, 4497; *cf. Gellerman v. Jefferson Pilot Financial Ins. Co.*, 376 F. Supp. 2d 724, 733-34 (S.D. Tex. 2005) ("An administrator is not allowed to pick and choose evidence on which to rely as it did in this case. This manner of handling the evidence amounts to an abuse of discretion because the defendants ignored key statements and conclusions in the FCE.").

Prudential contends that the functional capacity evaluation is not probative because the reports were "based entirely on [Gallegos'] self-reports of pain, what she claimed she could and could not do." Opp'n to Pl. Mot. 8, ECF 44. However, the functional capacity evaluation also includes the observation of the evaluator, as well as other tests that do not entirely depend on Gallegos' self-reports, including grip and pinch strength tests that assessed her finger and manual dexterity. AR 4396-97. Mr. Nelson, the evaluator, also found that Gallegos provided full physical effort during the evaluation and had movement patterns that "were consistent with her pain statements." AR 4402-03. The Court thus finds this evaluation to be probative and deserving of valued consideration from Prudential's reviewers. In addition, courts have rejected attempts to ignore self-reported symptoms such as that of Prudential's here. *See, e.g.*, *Gilmore v. Liberty Life Assurance Co. of Boston*, 2014 WL 1652048, at *6 (N.D. Cal. Apr. 24, 2014) (overturning denial where administrator's doctors noted "plaintiff's reports of pain" but "disregarded those self-reports"); *Stout v. Hartford Life and Acc. Ins. Co.*, 58 F. Supp. 3d 1020, 1030 (N.D. Cal. 2013) (overturning denial where administrator's doctors ignored "cumulative effect" of side-effects including musculoskeletal pain); *Moody v. Liberty Life Assur. Co. of Boston*, 595 F. Supp. 2d 1090, 1099 (N.D. Cal. 2009) (overturning denial where administrator's doctors ignored "severe neck, arm, and back pain" that had been consistent "over a long period of time"). Accordingly, the opinions of Gallegos' treating doctors and the functional capacity evaluations support that Gallegos was "more likely than not" disabled under the terms of the Jazz Pharmaceuticals Long-

Term Disability Plan.

### ii. Prudential's Reviewing Doctors' Conclusions and Criticisms for Alleged Lack of Objective Evidence

Diagnosis of SLE is established where a patient satisfies at least 4 of 11 criteria established by the American College of Rheumatology ("ACR"). AR 4376. The only rheumatologist to clinically examine Gallegos was her treating rheumatologist, Dr. Neuwelt. Dr. Neuwelt is a highly credentialed physician specializing in Lupus, such that his "peers consider [him] an expert in diagnosing and treating lupus." AR 4376; *see Isabel v. Hartford Life & Acc. Ins. Co.*, No. 97-4683, 1999 WL 38854, at *3 (N.D. Cal. Jan. 28, 1999) (recognizing Dr. Neuwelt's expertise and according more weight to his Lupus diagnosis in an ERISA disability case). Based on his clinical examinations of Gallegos, Dr. Neuwelt found "9 out of 11 ACR diagnostic criteria: Malar rash, discoid rash, photosensitivity, oral ulcers, arthritis, renal disorder, neurologic disorder, immunologic disorder (as shown by her positive lupus anticoagulant confirmed by Dr. Joelson), antinuclear antibody." AR 4376; *see also* AR 610-11.

Prudential's two rheumatologists did not deny Gallegos' Lupus diagnosis but concluded that she had no limitations to perform her work. AR 4043-51; AR4280-90; AR 4495. Prudential's doctors neither examined nor talked to Gallegos prior to rendering their decisions. AR 4043-51; *cf. Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1318, 1323 (D. Or. 2012) (noting that Dr. Alghafeer "did not examine" claimant with rheumatologic condition and ultimately finding the treating physicians' opinions more credible). Dr. Alghafeer agreed that Gallegos "had symptoms of fatigue" yet he decided it was not relevant since there was no "de-conditioning" such as "muscle wasting," and that there "was no documentation that her fatigue had resulted in any accidents at work place [sic] or while driving." AR 4049.

Prudential's second rheumatologist, Dr. Sara Kramer, also concluded that Gallegos was not disabled after conducting a paper review and soliciting opinions from Gallegos' treating doctors. After speaking with Gallegos' doctors, Dr. Kramer made a telephone call to Dr. Selkirk, Prudential's other reviewing doctor. AR 4493. After hearing that Dr. Selkirk "found no disability from a neurological view point," Dr. Kramer concluded the "records do not support this

diagnosis" of Lupus.  AR 4495.  In reaching that conclusion, Dr. Kramer noted that record lacks laboratory tests in support of her diagnosis of "SLE and relapsing polychondritis," including antinuclear antibodies (ANA), antiphospholipid antibodies, lupus anticoagulant, and erythrocyte sedimentation rate (ESR).  AR 4495-96.  Dr. Kramer found that "no documentation of a rash consistent with SLE," "[t]here is no mention of her looking fatigued [and] [t]here is no documentation of memory difficulties."  Dr. Stephen Selkirk, as Prudential's reviewing neurologists, reached the same conclusion that Gallegos has no disability because there were no "objective data to support the presence of cognitive dysfunction" and that her migraines were getting better with botox injections.  AR 4173-74.

Unlike in a social security administration case, there is no rule requiring ERISA plan administrators to afford greater weight to examining and treating doctors.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  However, "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative."  *Paese v. Hartford Life & Acc. Ins. Co.,* 449 F.3d 435, 442 (2d Cir.2006); *see also Black & Decker,* 538 U.S. at 832 ("it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual" (internal quotation marks, citation, and alterations omitted)); *cf. Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1131 (C.D. Cal. 2015) (noting that "the long treatment history lends some credibility to Dr. Levy's reports" but also recognizing that "they may also have resulted in assessments that were biased in her favor").

Here, the Court finds that the evidence from Gallegos' treating physicians to be probative, which Prudential's reviewers failed to take into account and often directly contradict without an adequate explanation.  With respect to Dr. Alghafeer, it appears that under his reasoning, a workplace or driving accident, or muscle wasting, would be required to qualify for disability, which the Court does not find persuasive.  Instead, Dr. Alghafeer should have explained why the functional capacity evaluation or the opinions of Gallegos' doctors fail to demonstrate Gallegos' inability to perform her job, but no such adequate explanation was provided.  He also failed to talk to Gallegos or any of her treating doctors.  Yet, he ignored Gallegos' longstanding medical history

1    and complications which stem from a disability that Prudential acknowledged just a few months

2    earlier.  Dr. Alghafeer also stated that his review was only from a "rheumatology perspective," and

3    that Gallegos' non-rheumatological conditions such as her migraine headache, shoulder surgery,

4    chronic sinusitis and endocrine issues should have been reviewed by other specialists.  AR 4049.

5    As such, Dr. Alghafeer's opinion was of a very limited scope.

6         Dr. Kramer's conclusions are also not persuasive because they did not take into account

7    and often directly contradicted the positive 9 out of 11 diagnostic criteria as determined by Dr.

8    Neuwelt, the opinions of Gallegos' other doctors, and the results of functional capacity evaluation.

9    For example, Dr. Neuwelt's examination notes on Gallegos' alar rash, discoid rash,

10   photosensitivity, and oral ulcers are some of the symptoms consistent with an SLE diagnosis and

11   yet Dr. Kramer disregarded those observations.  Dr. Kramer also discounted Dr. Neuwelt's

12   determination that Gallegos tested positive for lupus anticoagulant stating that there was no record

13   of this test.  AR 4496.

14        As to Dr. Selkirk's determination that there was no objective data, such as an EMG, to

15   support the presence of cognitive dysfunction, this determination does not definitively answer the

16   question whether Gallegos has the ability to concentrate and whether her fatigue and other

17   symptoms prevent her from working.  Dr. Joelson stated that "subtle abnormalities [attributed to

18   polynueopathy] can be missed by such electrophysiologic tests," and Dr. Selkirk fails to address

19   this point.  AR 4370.   The Ninth Circuit has further recognized that there are certain debilitating

20   syndromes, such as chronic fatigue syndrome and fibromyalgia, for which there are no specific

21   diagnostic tests.  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011).

22   As such, an absence of an objective x-rays or blood tests cannot be the sole ground for rejecting a

23   claim for those disabilities.  *See id.*  Here, Prudential does not specify what types of "objective"

24   evidence could definitively demonstrate migraines or one's ability to concentrate or multitask, and

25   it might well not exist.  Regardless, the Court does consider Dr. Selkirk's criticism of lack of

26   objective evidence.  After giving it the proper weight, the Court still finds the functional capacity

27   evaluation, as well as other evidence in the record, has adequately shown that Gallegos suffers

28   from a disability the prevents her from doing her work.

1   After receiving the first denial of the appeal, Gallegos submitted additional records to

2   Prudential showing that her blood tested positive for the Lupus anticoagulant and had elevated

3   ESR, as well as a copy of Dr. Marinos's report diagnosing her with "Cognitive Disorder (due to

4   SLE)." AR 4286-87; AR 4217-18, AR 4672; AR 4222, AR 4232.   After reviewing these

5   supplemental records, Dr. Kramer's conclusions remained unchanged.  AR 4289.  She found the

6   ESR and lupus anticoagulant tests fail to establish a disability.  *Id.*  The Court finds these

7   determinations by Prudential based on these additional test results to be equally unpersuasive.

8   Prudential's reviewers first faulted Gallegos for not providing "objective" evidence, even though

9   at least some of Dr. Neuwelt's examination notes fell into that category.  But after Gallegos

10  supplied certain laboratory test results consistent with her disability, Prudential rejected them as

11  insufficient nonetheless.  The Court recognizes that a laboratory test, such as lupus anticoagulant

12  and ESR, do not by themselves establish a disability.  Rather it is the extent of the symptoms

13  associated with Lupus that could render one disabled.  The symptoms, both observed by Gallegos'

14  doctors and self-reported, are consistent with a diagnosis of SLE and her doctors' opinions that

15  she is disabled.  Gallegos' disability is further supported by the findings made by the consulting

16  doctor of the Social Security Administration and the functional capacity and vocational evaluation.

17  Yet, Prudential discounted these parts of the record as merely being "self-reported" without much

18  of an explanation.  Her positive tests for Lupus anticoagulant and elevated ESR are supposedly the

19  "objective" evidence Prudential's doctors were looking for but after receiving them, Prudential

20  still rejected them as insufficient to demonstrate a disability.  Furthermore, Prudential cannot

21  ignore the fact that Gallegos has had both the condition and the associated symptoms back when it

22  determined her to be disabled in October 2014.

23  *Yancy v. United of Omaha Life Ins. Co.* involved a similar set of circumstances for a

24  Lupus-based disability claim, and it is instructive here.  No. 14-9803, 2015 WL 9311729, at *13

25  (C.D. Cal. Dec. 18, 2015).  The insurer in *Yancy* denied the claim purportedly because "there was

26  no evidence of testing to confirm" the diagnosis.  *Id.* at*17.  The court found, however, that the

27  claimant's medical records showed clinical testing to support a Lupus diagnosis, but that the

28  insurer's reviewers had simply disregarded it.  *Id.*  Moreover, it noted that the claimant's "medical

18

record contained the opinion of Plaintiff's treating neurologist that she believed Plaintiff to be suffering from migraines [and] Defendant was not entitled to arbitrarily cast aside that opinion and conclude that there was 'no evidence' of migraines." *Id.* (citation omitted). Given discrepancies between the opinions of the insurer's doctors and the clinical evidence established by treating doctors, the *Yancy* court found a clear abuse of discretion by the insurer, and ordered benefits instated. *Id.* at *24. As in *Yancy*, the Court does not find persuasive assertions made by Prudential's doctors that often contradict or neglect to consider other parts of the record showing Gallegos' disability.

Another ERISA Lupus-disability case, *Bledsoe v. Metro. Life Ins.* further illustrates the principle that an insurer is prohibited from ignoring a clinical Lupus diagnosis. 90 F. Supp. 3d 901 (C.D. Cal. 2015). As in this case, the insurance company doctor in *Bledsoe* concluded the "[file] received does not support you are unable to work . . . all exam findings normal [sic]." *Id.* at 906. The court noted, however, that the claimant's doctor had informed the insurer's doctor that the claimant "complained ongoing fatigue, weakness, arthralgias, recurring headaches, and inability to cope with the stressful work environment" were reasons why the claimant was unable to return to work. *Id.* at 908. Those complaints were dismissed by the insurer as "subjective complaints." *Id.* at 913. Just like here, the insurer also argued that a diagnosed medical condition "alone does not mean . . . disabled as defined in the Plan." *Id.* at 912. Critical of these arguments based on self-reported symptoms, the *Bledsoe* court noted that treating doctor's "opinions may primarily derive from Plaintiff's subjective complaints, but the subjective complaints sustain the objective testing previously explored." *Id.* at 913. It continued to state that "[i]t is the objective testing that substantiated Plaintiff's condition, and Plaintiff's subjective complaints support those symptoms." *Id.* (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675-77 (9th Cir. 2011) (reversing the plan administrator's denial because each physician that examined the plaintiff determined that he was disabled and the plan administrator's demand for objective testing were illogical "because such objective measures as blood tests are used to rule out alternative diseases, not to establish the existence of [the medical condition]."))."

Like in *Bledsoe*, Gallegos' doctors reached their diagnoses via both laboratory tests and

1   physical examinations that substantiated a diagnosis of SLE, and in turn, her subjective complaints

2   of fatigue, pain, and headaches were supported the symptoms already verified. *See Bledsoe*, 90 F.

3   Supp. 3d at 913. Prudential argues that *Yancy* and *Bledsoe* are distinguishable because unlike

4   Gallegos, the claimant in *Yancy* tested positive for antinuclear antibodies ("ANA") and the

5   claimant in *Bledsoe* had "a high-titer double-stranded DNA at 800" and "a positive anti-neuronal

6   cell antibody." Opp'n to Pl. Mot. 4. However, the *Yancy* and *Bledsoe* courts' decision did not

7   turn on those specific tests. There is also no authority holding that a positive test for ANA, "a

8   high-titer double-stranded DNA at 800," or "anti-neuronal cell antibody" would be necessary to

9   support a finding of disability, while a positive test for lupus anticoagulant or elevated ESR could

10  not. As discussed above, the cumulative evidence as a whole weighs in favor of finding Gallegos

11  disabled.

### iii.    Prudential's Failure to Consider Side Effects and Work Stress

13          The Court also finds that Prudential's doctors' findings fail to take into account side effects

14  of Gallegos' medication and stress of her job, which contribute to her disability. *See Stout*, 58 F.

15  Supp. 3d at 1030 (criticizing administrator's failure to consider multisystemic symptoms'

16  "cumulative effect on Plaintiff's ability to perform her job."). Gallegos takes the following

17  medications that cause cognitive and physical side-effects: methotrexate, Plaquenil, and

18  prednisone for her Lupus. AR 4265. Prednisone causes her "agitation, dizziness, fatigue,

19  irritability, mood changes, shortness of breath, weight gain, swelling, development of hump on the

20  back of my neck, and facial hair." AR 4421. Methotrexate has caused "hair loss, skin turning

21  bright red when going outside, lower leg swelling where my feet can barely fit into my shoes,

22  severe muscle cramps, including in my feet and fingers, fatigue, dizziness, nausea, fuzzy vision

23  and rapidly graying hair." AR 4421-22. Prudential's failure to consider these side effects and the

24  cumulative effect of her co-morbid medical conditions weighs against Prudential. *See Frei v.*

25  *Hartford Life Ins. Co.*, No. 05-01191-EDL, 2006 WL 563051, at *11 (N.D. Cal. Mar. 7, 2006)

26  (insurer must consider side effects of medication in evaluating whether claimant is disabled).

27          In regard to work-related stress, not only have her doctors opined that stress exacerbates

28  her symptoms, AR 4173; *see also* AR 4370, but Prudential's doctor, Dr. Kramer, also

20

1    acknowledged this in her medical record summary when she wrote: "Work is starting to be more

2    stressful and is a definite trigger for her." AR 4472-73; *cf. Bledsoe*, 90 F. Supp. 3d at 908

3    ("claimant's doctor had informed the insurer's doctor that the claimant 'complained ongoing

4    fatigue, weakness, arthralgias, recurring headaches, and inability to cope with the stressful work

5    environment' were reasons why the claimant was unable to return to work."). Prudential's failure

6    to consider this in its medical and vocational analyses of Gallegos' condition weighs against a

7    decision in its favor.

8            **iv.     The Sporadic Nature of Lupus Flares Precludes Consistent Work Capacity**

9            Courts recognize that the unpredictability of Lupus symptoms is another reason to preclude

10   an ability to work reliably. *See Thivierge v. Hartford Life & Acc. Ins. Co.*, No. 05-0163, 2006 WL

11   823751, at *13 (N.D. Cal. Mar. 28, 2006) (recognizing that Lupus claimant has "bad days, when

12   she cannot function. It is unpredictable whether Plaintiff will have a good day or a bad day, and, as

13   Dr. Ho notes, the bad days can continue for up to two weeks. A full-time employer cannot handle

14   such inconsistent attendance and unpredictability."); *see also Bledsoe*, 90 F. Supp. 3d at 918

15   (having "difficulty envisioning a job similar in nature or one that she is reasonably qualified for

16   that would not cause medical flare-ups to Plaintiff's lupus"). Because Gallegos might be stable at

17   various points does not mean that the debilitating symptoms will not be exacerbated if she returns

18   to work on a full-time basis.

19           Dr. Rubinstein, Gallegos's doctor of over 21 years, agrees: Lupus symptoms of "pain,

20   mental fogginess, and significant fatigue . . . precludes [sic] her ability to work with any degree of

21   regularity because of the debilitating and unpredictable nature of her baseline symptoms and

22   symptomatic flares." AR 4373. Prudential's reviewers did not take the sporadic nature of Lupus

23   into account. Because Gallegos's symptoms (and headaches) flare randomly, this unpredictability

24   further contributes to her inability to work. *See Peterson v. Fed. Express Corp. Long Term*

25   *Disability Plan*, No. -05-1622, 2007 WL 1624644, at *34 (D. Ariz. June 4, 2007) (noting "that a

26   total-disability determination cannot reasonably hinge on whether an employee is minimally

27   capable, on a good day, at the right hour, of fulfilling her job duties in a barely tolerable fashion.

28   Qualification for employment requires an ability to work effectively and to be reliable").

### C. The Social Security Administration Decision

As noted above, the Social Security Administration reviewed the same medical records submitted to Prudential, but also hired neuropsychologist Janine Marinos, Ph.D. to perform an in-person psychological examination. AR 4587-90. Its decision finding Gallegos' disabled is further evidence in support of Gallegos' disability. Prudential correctly notes that no deference needs to be provided to Gallegos' social security benefits claim. The standards of the Plan and the standards of the Social Security Administration likely differ, but that does not mean that the decision should be disregarded in its entirety. *Mossler v. Aetna Life Ins. Co.*, No. 13-01945, 2014 WL 3587511, at *16 (C.D. Cal. July 21, 2014) (considering the plaintiff's SSDI award because the decision constituted additional support in determining plaintiff's benefit entitlement) (citing *Schramm*, 718 F. Supp. 2d at 1165)). Albeit with the distinction in standards, Gallegos' social security disability award suggests that she bears some restriction in her capability to work. While this award is not dispositive, the award does help Gallegos' showing that she is disabled.

### D. Whether Gallegos is Disabled Under "Any Gainful Occupation" Applicable to Her Experience and Training

The group disability insurance policy under which Gallegos is covered provides benefits in two stages, reviewed under separate standards, first under the "regular occupation" definition and the second under the "any gainful occupation." AR 4923. The first stage applies for the first 24 months of coverage and is arguably less stringent because benefits are paid when a claimant cannot perform her "regular occupation." *Id.* Here, it is undisputed that Drug Safety Operations Manager is Gallegos's "regular occupation." The second and final stage applies after the first 24 months expire, and benefits are paid where a claimant cannot perform "any gainful occupation for which you are reasonably fitted by education, training or experience." *Id.*

Because Prudential denied Gallegos' claim under the "regular occupation" definition of disability, it did not evaluate whether GAllegos was disabled under the "any gainful occupation" definition of disability. AR 4642. Thus, the Court remands the case back to Prudential to assess Gallegos under the "any gainful occupation" definition of disability. *Taft v. Equitable Life Assurance Soc'y of the U.S.*, 9 F.3d 1469, 1472 (9th Cir. 1993) (holding that determinations of entitlement to ERISA-governed benefits are to be made in the first instance by the claim

administrator, not by a court sitting in review thereof); *Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996); *Allenby v. Westaff, Inc.*, No. 04-2423-TEH, 2006 WL 3648655, at *8 (N.D. Cal. Dec. 12, 2006).  Although Gallegos argues that her occupation is sedentary just like any occupation applicable to her training and education, Prudential, and not this Court, should still be the one making a determination in the first instance.

## IV.    ORDER

Based upon the above findings of fact and conclusions of law, the Court finds that Gallegos has shown by a preponderance of the evidence that she was disabled from her regular occupation as defined under the Policy, and Prudential's termination of long-term disability benefits and its subsequent denial of her appeal were incorrect under *de novo* review.  Gallegos is entitled to an award of unpaid benefits as well as monthly disability benefit payments for the first 24-month period.

The parties shall, within thirty (30) days of the date of this Order, (a) meet and confer to resolve the specific amount of disability benefits due Gallegos for the "regular occupation" period, including interest, and less any appropriate set-offs, and (b) submit a proposed judgment, that is consistent with this Order.

Gallegos is entitled to attorneys' fees and costs under 29 U.S.C. § 1132(g).  Within thirty (30) days of this Order, Gallegos shall file a motion for attorneys' fees, supported with appropriate evidence.  Prudential shall have fourteen (14) days to respond to Gallegos' motion or the evidence submitted in support of it.  If Gallegos fails to file a motion for attorneys' fees within this timeframe, the Court will enter its final judgment in this action and close the case.

**IT IS SO ORDERED.**

Dated: June 5, 2017

_____
BETH LABSON FREEMAN
United States District Judge